# In the United States Court of Federal Claims

No. 20-814
Filed: December 17, 2020
Reissued: January 15, 2021[1]

|  |  |  |
|---|---|---|
| PERSPECTA ENTERPRISE SOLUTIONS LLC, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) ) | Bid Protest; Tucker Act; Unsuccessful Offeror; Organizational Conflict of Interest; Material Misrepresentation; Cost Realism; Price Realism; Unequal Discussions; Technical Evaluation; Disparate Treatment; Prejudice; Injunctive Relief |
| THE UNITED STATES, | ) ) |  |
| Defendant, | ) ) |  |
| and | ) ) |  |
| LEIDOS, INC., | ) ) ) |  |
| Defendant-Intervenor. | ) ) |  |

*Daniel R. Forman*, Crowell & Moring LLP, Washington, DC, for plaintiff.

*Kelly A. Krystyniak*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*James J. McCullough*, Fried Frank, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

***SMITH**, Senior Judge*

       This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Perspecta Enterprise Solutions, LLC ("Perspecta"), challenges the evaluation of offerors and the award decision issued by the Department of the Navy, Naval Information Warfare Systems Command ("Navy" or "Agency") for secure end-to-end Information Technology ("IT") services under Request for Proposal No. N00039-18-R-0005 ("RFP" or "Solicitation"). Specifically, plaintiff challenges the Agency's award to defendant-intervenor, Leidos, Inc. ("Leidos"), based on the following: (1) the Contracting Officer's ("CO") failure to conduct a reasonable investigation into an Organizational Conflict of Interest ("OCI"); (2) Leidos' material misrepresentation of the availability of

---

[1]    An unredacted version of this opinion was issued under seal on December 17, 2020. The parties were given an opportunity to propose redactions and those redactions are included herein.

personnel within its proposal; (3) the Navy's flawed price and cost realism; (4) the Navy's failure to engage in meaningful discussions with plaintiff; and (5) the Navy's flawed technical and managerial factor analysis. *See generally* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 54 [hereinafter Pl.'s MJAR]. In response, defendant and defendant-intervenor contend that plaintiff's OCI challenge is waived and that plaintiff has failed to demonstrate that the award decision was irrational or the result of prejudicial violations of law. *See generally* Defendant's Response in Opposition to Plaintiff's Motion for Judgment upon the Administrative Record, and Cross-Motion for Judgment upon the Administrative Record, ECF No. 68 [hereinafter Def.'s CMJAR]; Cross-Motion of Defendant-Intervenor Leidos, Inc. for Judgment on the Administrative Record and Response to Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 69 [hereinafter Def.-Int.'s CMJAR]. For the reasons set forth below, the Court denies plaintiff's Motion for Judgment on the Administrative Record and grants defendant and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record.

## I.    Background

Plaintiff is the incumbent contractor for the Navy's predecessor Next Generation Enterprise Network ("NGEN") contract. Complaint at 6, ECF No. 1 [hereinafter Compl.]. On October 18, 2018, the Navy issued the RFP for the Navy's Next Generation Enterprise Network Re-Compete ("NGEN-R") Service Management, Integration, and Transport contract, which sought secure end-to-end IT services to over 400,000 hardware devices and 60,000 users via the Navy Marine Corps Intranet and the Marine Corps Enterprise Network, as well as 30,000 devices and over 45,000 users via the Navy Enterprise Network.[2] Administrative Record 13455 [hereinafter AR]. The RFP contemplated the award of a single Indefinite Delivery/Indefinite Quantity contract with firm, fixed-price ("FFP"), fixed-price-incentive fee, and cost-plus-fixed fee ("CPFF") contract line items ("CLIN"). AR 93–350. The RFP anticipated awarding a contract with a potential estimated value of $7.7 billion on a base period of five years, with three one-year option periods. AR 475. The RFP provided for a best-value trade-off evaluation based on the following six factors: (1) Technical Approach, (2) Management Approach, (3) Past Performance, (4) Transition Approach, (5) Cost/Price, and (6) Gate Criteria. AR 14078. The first three factors would be weighted in descending order of importance and, when combined, would be significantly more important than Factor 5. AR 14078. Factor 4 and Factor 6 were to be evaluated on an "acceptable/unacceptable basis" and would not be a part of the trade-off analysis. AR 14078. Only Factors 1, 2, and 5 are relevant to this protest. Pl.'s MJAR at 3, n.1.

Factor 1: Technical Approach—contained the following two equally weighted subfactors: Systems Engineering (Subfactor 1.1), and Network Transformation/Modernization Sample Exercise (Subfactor 1.2). AR 14081. Based on the Navy's assessment of the strengths, weaknesses, and deficiencies identified in each proposal, as well as the associated risk, offerors received one of the following adjectival ratings: Outstanding, Good, Acceptable, Marginal, and Unacceptable. AR 14079–81. The RFP required that, under Factor 2: Management Approach, the Navy was to utilize the aforementioned adjectival ratings to assess proposals according to the following four equally weighted subfactors: Program Management Plan (Subfactor 2.1),

---

[2]      The Request for Proposal ("RFP") was amended fifteen times. *See* AR 14095–123.

Network Operations (Subfactor 2.2), Tools Management and Data Access (Subfactor 2.3), and Supply Chain Risk Management (Subfactor 2.4).  AR 14070, 14081–82.  Under Factor 5: Cost/Price, the RFP required the Navy to conduct a cost-realism analysis for all cost-type line items, to conduct a price realism analysis for all fixed-price line items, and to consider whether an offeror's prices for the fixed price CLINs were materially unbalanced.  AR 14085–86.

Perspecta, Leidos, and a third offeror submitted initial proposals on January 24, 2019.  *See generally* AR Tab 22; AR Tab 23.  After evaluating initial proposals from the three offerors, the Navy established a competitive range, including Perspecta and Leidos, and held discussions with these two offerors.  AR 25426.  Following discussions, Perspecta and Leidos submitted final proposal revisions ("FPRs") on September 12, 2019.  AR 25426.  The Source Selection Evaluation Board ("SSEB") evaluated the two remaining proposals and awarded Leidos sixty-six strengths, three weaknesses, and no significant weaknesses.  AR 25099–182.  The SSEB assigned Perspecta nineteen strengths, fifteen weaknesses, and five significant weaknesses.  AR 25183–259.  Perspecta and Leidos were evaluated and the results of the trade-off factors (Factor 1, 2, 3, and 5) were as follows:

|  | **Factor/Subfactor** | **Leidos** | **Perspecta** |
|---|---|---|---|
| **Factor 1: Technical Approach** | Subfactor 1.1 Systems Engineering | Outstanding | Marginal |
|  | Subfactor 1.2 Network Transformation/Modernization | Outstanding | Acceptable |
| **Factor 2: Management Approach** | Subfactor 2.1 Program Management Plan | Outstanding | Good |
|  | Subfactor 2.2 Network Operations | Outstanding | Marginal |
|  | Subfactor 2.3 Tools Management and Data Access | Outstanding | Marginal |
|  | Subfactor 2.4 Supply Chain Risk Management | Acceptable | Acceptable |
| **Factor 3: Past Performance** | Confidence | Substantial Confidence | Satisfactory Confidence |
| **Factor 5: Cost/Price** | Total Evaluated Cost/Price | $6,322,574,086.55 | $6,849,265,795.92 |

Def.-Int.'s CMJAR at 5; *See* AR 25427.  The Source Selection Authority ("SSA") evaluated the reports of both the SSEB and the Cost/Price Evaluation Board ("CPEB") and selected Leidos for award.  AR 25366.  According to the Navy's Source Selection Decision Document, Leidos' proposal was more highly rated under the Technical Subfactors, and its evaluated cost/price was lower than Perspecta's.  AR 25428.  On February 5, 2020, the Navy notified Perspecta that it had awarded the contract to Leidos with a potential contract value of $7,729,639,286.  *See* AR 25440.

In selecting Leidos for award, the SSA noted that Leidos submitted a "clearly superior proposal," as it received "'Outstanding' ratings in five of the six most important subfactors while Perspecta received 'Marginal' ratings in three of the six most important subfactors." AR 25437. Moreover, the SSA clarified that she based her decision on the "underlying rational for the ratings," rather than basing her award only on adjectival ratings. AR 25437. Furthermore, the SSA noted that Leidos' proposal for Factor 1, the most important factor, "demonstrate[d] an exemplary understanding of, and superior approach to, Model Based Systems Engineering [] tailored to the Government's requirements" and offered a "technically efficient, future-resilient, forward thinking, agile approach and is on the leading edge of industry standards." AR 25437. Finally, the SSA "determined that a tradeoff among cost or price and non-cost factors is not warranted," as she could not justify a price premium for Perspecta's "technically inferior" proposal, which she determined was "significantly less advantageous to the Government, and present[ed] a higher risk of unsuccessful contract performance." AR 25438.

On March 9, 2020, Perspecta filed a protest with the Government Accountability Office ("GAO"), challenging the Agency's award decision. AR 27909. The GAO denied Perspecta's protest on June 17, 2020, concluding that the Navy "reasonably determined that Leidos did not gain an unfair advantage based on the hiring of a former government employee" and that the evaluation "was reasonable and that the majority of the incumbent protestor's complaints amount to disagreement with the agency's evaluation." AR 30084. Finally, the GAO concluded that any errors in the Agency's evaluation "did not result in competitive prejudice because Perspecta's proposal remains higher-priced and lower-rated when viewed in the most favorable light to Perspecta." AR 300084. This protest followed.

On July 2, 2020, Perspecta filed its Complaint with this Court. *See generally* Compl. On September 2, 2020, plaintiff filed its Motion for Judgment on the Administrative Record. *See generally* Pl.'s MJAR. On October 2, 2020, defendant filed its Response to plaintiff's Motion and its Cross-Motion for Judgment on the Administrative Record. *See generally* Def.'s CMJAR. Defendant-intervenor filed its Response and Cross-Motion that same day. *See generally* Def.-Int.'s CMJAR. Plaintiff filed its Reply and Response on October 15, 2020. *See generally* Plaintiff's Response to Defendants' Cross-Motions for Judgment on the Administrative Record and Reply in Support of its Motion for Judgment on the Administrative Record, ECF No. 72 [hereinafter Pl.'s Resp.]. On October 26, 2020, defendant and defendant-intervenor filed their respective Replies. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record, ECF No. 73 [hereinafter Def.'s Reply]; Reply of Defendant Intervenor Leidos, Inc. in Support of its Cross-Motion of [sic] for Judgment on the Administrative Record, ECF No. 74 [hereinafter Def.-Int.'s Reply]. The Court held oral argument on November 19, 2020. The parties' Motions are fully briefed and ripe for review.

## II.      Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in

cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012).  Although the Tucker Act explicitly waives the sovereign immunity of the United States against such claims, it "does not create any substantive right enforceable against the United States for money damages."  *United States v. Testan*, 424 U.S. 392, 398 (1976).  Rather, to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages."  *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

The Tucker Act also affords this Court with jurisdiction over bid protest actions.  28 U.S.C. § 1491(b).  This Court evaluates bid protests under the Administrative Procedure Act's standard of review for agency actions.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Notably, agency procurement actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4).  Moreover, "[t]he arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Agencies, and contracting officers in particular, are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332).

Under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), a party may file a motion for judgment upon the administrative record for the Court to assess whether an administrative body, given all disputed and undisputed facts in the record, acted in compliance with the legal standards governing the decision under review.  *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 585 (2006)).  On a motion for judgment upon the administrative record, the parties are limited to the Administrative Record, and the Court makes findings of fact as if it were conducting a trial on a paper record. RCFC 52.1; *Bannum*, 404 F.3d at 1354.  Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  *Bannum*, 404 F.3d at 1355.  When a protestor claims that an agency's decision violates a statute, regulation, or procedure, the protestor must show that the alleged violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333.  The Court will "interfere with the government procurement process 'only in extremely limited circumstances.'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.-Fed. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).  "If the [C]ourt finds a reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). The Court cannot substitute its judgment for that of an agency, even if reasonable minds could reach differing conclusions.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

## III.    Discussion

### A.    Organizational Conflict of Interest

In its Motion for Judgment on the Administrative Record, plaintiff argues that the CO "failed to meaningfully consider" whether a conflict existed based upon Leidos employee ███ ████████, a former Navy official, prior "access to nonpublic, competitively-useful information." Pl.'s MJAR at 7.  Plaintiff makes a number of arguments in support of its Organizational Conflict of Interest ("OCI") claims.  *See generally* Pl.'s MJAR.  In response to plaintiff's OCI allegations, defendant argues that such claims are waived, as "Perspecta knew or should have known that Mr. ██████ was working for Leidos before the due date for offeror proposals," and, as such, "this ground of protest is therefore untimely and must be dismissed."  Def.'s CMJAR at 6.  Defendant-intervenor likewise argues that plaintiff's OCI claims have been waived.  Def.--Int.'s CMJAR at 8  After a thorough review of the record, the Court concludes that plaintiff waived its OCI challenge pursuant to the well-established precedent of *Blue and Gold*.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

The Court of Appeals for the Federal Circuit ("Federal Circuit") held the following in *Blue and Gold*:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

*Id.* at 1313.  The Federal Circuit has further held that "the reasoning of *Blue and Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1381 (Fed. Cir. 2012).  Moreover, the Federal Circuit recently confirmed that the waiver doctrine applies to OCIs, especially where a plaintiff "exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before awards were made."  *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020).

The Court finds that plaintiff knew or should have known that Mr. ██████ was employed by Leidos.  On November 27, 2017, over a year before the submission of initial proposals, Mr. ██████ attended the Agency's "engineering day," along with representatives from Perpecta's predecessor entities. AR 25–26.  Moreover, Mr. ██████ appeared in a March 28, 2018 article about NGEN IT services—along with an upper level employee from Perspecta's U.S. public sector group—specifically listing Mr. ██████ as a member of the capture team for this procurement.  Def.'s CMJAR at 7; *see also* Ross Wilkers, *Inside the Navy NGEN IT services competition's teams and stakes*, Washington Tech., Mar. 26, 2018.  As Mr. ██████'s involvement in the NGEN-R procurement was clearly a matter of public record, Perspecta knew or should have known about the potential OCI before award.  Therefore, by not raising the issue in a pre-award protest, Perspecta waived its OCI challenges.

- 6 -

### B.    Material Misrepresentations

Plaintiff next asserts that "Leidos appears to have knowingly misrepresented the availability of a named employee proposed to perform a critical role." Pl.'s MJAR at 10. Specifically, plaintiff alleges that ███████████, Leidos' former Enterprise Services Operations Manager, had experience "second only to Program Manager ███████████," and that "the management plan for service delivery was specifically designed to 'establish[] a realistic span of control that enables **Mr. ███████** to effectively supervise *all aspects of service delivery operations*.'" Pl.'s MJAR at 10–11 (quoting AR 4762).  Finally, plaintiff alleges that "Leidos became aware that Mr. ███████ was leaving the company, and would not be available to perform the contract," four months prior to FPR submissions.  *Id.* at 11.

In response, defendant argues that "[t]he RFP did not require offerors to propose key personnel, nor did it request credentials for prospective employees on their proposal." Def.'s CMJAR at 12 (citing AR 13777).  Additionally, defendant contends that failure to inform the Agency that non-key employees named in a proposal had left the company "does not rise to the level of a 'material misrepresentation.'" Def's CMJAR at 14.  Finally, defendant-intervenor notes that "the RFP specifically omitted the requirement for the offeror's Program Management Plans to name personnel as part of the contents of their plans," and, as such, "the Navy's evaluation of Leidos' proposal was not materially influenced by Mr. ███████ being identified as it Enterprise Service Delivery Operations Manager" as "none of the strengths assigned to Leidos' proposal . . . were attributable to Mr. ███████ personally." Def.-Int.'s CMJAR at 15–16.

When arguing that a material misrepresentation occurred, a "plaintiff must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the awardee]'s proposal for the contract award."  *Blue & Gold Fleet, L.P, v. United States*, 70 Fed. Cl. 487, 495 (2006) (citation omitted), *aff'd*, 492 F.3d 1308.  This Court has previously held that a material misrepresentation has not occurred when an offeror "includ[es] in its proposal credentials of people who had not committed to serve as its staff members." *Phoenix Mgmt. v. United States*, 107 Fed. Cl. 58, 70 (2012), *aff'd*, 516 F. App'x 927 (Fed. Cir. 2013).

In the procurement at issue, Leidos noted personnel that it determined were key to its proposed approach, but Mr. ███████ was not mentioned.  AR 4754.  Notably, the Solicitation did not require evaluation of named personnel, and nothing in the record demonstrates that Mr. ███████ was a material factor in the Navy's evaluation.  Finally, the Agency does not even mention Mr. ███████ in any of its evaluation documents.  *See* AR Tabs 25064–265, 25362–412, 25422–38.  Consequently, the Court finds that a change in unnamed, non-key personnel does not constitute a material change, and, as such, Leidos' failure to update its proposal to reflect that Mr. ███████ left the company did not constitute a "material misrepresentation."

### C.    Price Realism

In its Motion for Judgment on the Administrative Record, plaintiff alleges that the Navy's price realism evaluation was arbitrary and capricious for the following two reasons: (1) "based only on a partial record, GAO correctly determined that, in evaluating the realism of individual

labor rates, the Navy utilized a flawed methodology that resulted in a range of 'realistic' rates that was so wide that every proposed rate was deemed realistic"; and (2) "the complete record reveals that the Navy's evaluators deemed a majority of Leidos' FFP CLIN pricing to be unrealistically low, but the Navy failed to assess Leidos' technical risk as required by the RFP and applicable law."  Pl.'s MJAR at 13–14.

### 1.    Fixed-Price Labor Rates

The Court will first address plaintiff's argument that the Navy utilized a flawed methodology in evaluating the realism of individual labor rates. Specifically, plaintiff argues that "[h]ad the Navy utilized a rational methodology and adhered to the RFP, it would have recognized that a substantial percentage of Leidos' fixed labor rates were unrealistically low and, as a consequence, assigned Leidos a technical risk."  Pl.'s MJAR at 14.  In making this assertion, plaintiff contends that "the Navy's methodology resulted in acceptable ranges of labor rates that were so wide they were incapable of identifying unrealistic rates."  *Id.* at 15.  As a result, plaintiff alleges that the Navy failed to consider the recruiting and retention risks associated with Leidos' proposed low rates, which is "especially high because Leidos' proposal relies heavily on incumbent capture."  *Id.* at 16.

In response, defendant argues that "the two offerors proposed remarkably similar pricing, and the agency reasonably deemed both to be realistic."  Def.'s CMJAR at 17 (citing AR 25279). In fact, defendant alleges, "neither Perspecta nor Leidos proposed a single labor rate that was outside even the 1.5 standard deviation range, let alone two standard deviations."  *Id.* at 20. Defendant-intervenor highlights that "[t]he Navy found Leidos' proposed FFP labor rates to be realistic," AR 25285–86, and that "the SSEB found that Leidos' proposal demonstrated 'the ability to recruit, hire, on-board, and retain personnel to minimize disruptions to network operations and services during transition.'"  Def.-Int.'s CMJAR at 20 (citing AR 25176–77).

As this Court has previously held, "the nature and extent of a price realism analysis [are] ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 314, 358 (2009).  When analyzing price realism, the inquiry turns on whether the agency's analysis was "consistent with the evaluation criteria set forth in the RFP."  *Alabama Aircraft Indus. v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009).  When an RFP does not specify the particular analysis tool an agency must use, the agency has broad discretion to choose the methodology.  *See, e.g.*, *Northeast Mil. Sales, Inc. v. United States*, 100 Fed. Cl. 103, 118 (2011).

The Navy did not specify how the price realism analysis was to be conducted, but, rather, only required that the Agency "consider whether the proposed prices are realistic for the work to be performed" and "reflect a clear understanding of the contract requirements."  AR 14086. Moreover, the Solicitation directed that the SSA was to consider price realism in her best value trade off decision, but that unrealistic prices "[do] not necessarily result in a proposal being unawardable."  AR 14086.  To determine the realism of proposed labor rates, the CPEB created an independent government cost estimate ("IGCE") from an average of General Service Administration Alliant 2 benchmark rates from 2018.  The CPEB then averaged the IGCE with

Leidos' and Perspecta's proposed rates to establish realistic ranges for each labor category.  AR 25279.  The rationale behind the CPEB's analysis is explained as follows:

> The statistical analysis was performed on the two offerors and IGCE rates to better understand the magnitude of deviation from the statistical mean for each labor rate category in order to identify proposed rates that were too low.  This was done by calculating the Standard Deviation (SD) of the population (proposed rates per labor category).  A low SD indicates that the data points are closer to the average whereas a high SD indicates the data points are more spread out from the mean.  The CPEB utilized two standard deviations as this would identify any rate which is truly considered an outlier.  Therefore, the CPEB determined that if an Offeror's proposed rate was within two (2) SDs of a given labor category's average, it was realistic.

AR 25279.  The Navy determined that, based on the above evaluation, both Perspecta and Leidos proposed realistic prices.

Nothing in record leads this Court to believe that either offeror was prejudiced by the Agency's price realism analysis.  "To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  Neither offeror proposed FFP labor pricing that was found to be unreasonable.  Moreover, as the GAO points out, even if the Agency had utilized a 1.5 standard deviation range—as opposed to the 2 standard deviation range—all of Leidos' rates would have been found realistic and only Perspecta would have proposed rates outside of that range.  AR 30075.  Consequently, the Agency's utilization of a 2 standard deviation range really only benefits the protestor, not the awardee.  Therefore, the Court does not believe that the protestor was prejudiced by the Agency's price realism analysis.

## 2.    Fixed-Price CLINs

Second, the Court analyzes plaintiff's argument related to the Navy's failure to assess Leidos a technical risk for its low fixed-price CLINs.  Plaintiff contends that the Navy "ignored the risk its evaluators identified in Leidos' low rates," instead concluding "without explanation, that 'Leidos proposed efficiencies that may contribute to achieving the low prices proposed.'"  Pl.'s MJAR at 17–18 (citing AR 25285).  Plaintiff argues that such a conclusion fails for the following three reasons: (1) "there is nothing in the record as to the specific efficiencies that could support Leidos' significantly lower proposed labor hours and associated lower costs"; (2) "the Navy's price realism findings explicitly state that Leidos' low level of effort for certain CLINs was *not supported* by its proposed efficiencies"; and (3) "a comparison to Perspecta's proposed hours shows that Leidos proposed nearly *5 million hours less* than did Perspecta."  *Id.* at 18 (emphasis in original).  Finally, plaintiff contends that "[t]he SSA's failure to consider Leidos' low prices renders the Navy's evaluation and award decision inconsistent with the RFP's express terms."  *Id.* at 19.

In response, defendant argues that "while the RFP did provide that the agency would 'analyze the proposals to determine if prices on fixed-price CLINs are materially unbalanced'—including, but not limited to, labor rates—it did not proscribe the process Perspecta now advocates." Def.'s CMJAR at 21 (citing AR 10486). Defendant-intervenor points to a finding from the CPEB report, which stated that "Leidos' proposed level of effort for some of the services were determined low because the Offeror did not provide sufficient justifications to demonstrate its proposed prices were realistic for the work to be performed. However, Leidos proposed efficiencies that may contribute to achieving the low prices proposed." Def.-Int.'s CMJAR at 20–21 (quoting AR 25285). Moreover, defendant-intervenor alleges that, essentially, "the CPEB verified that the offerors' price/cost volumes were consistent with their respective unique technical approaches, including the assessment by the SSEB of the offerors' proposed levels of effort." *Id*. at 21.

The Court again highlights that "the nature and extent of a price realism analysis [are] ultimately within the sound exercise of the agency's discretion." *Afghan Am. Army Servs.*, 90 Fed. Cl. at 358. A price realism analysis will only lack a rational basis if the agency made "irrational assumptions or critical miscalculations." *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). In conducting a price realism evaluation, a comparison of the proposed prices will usually satisfy the requirement to perform a price analysis. FAR 15.305(a)(1) (2017). Furthermore, when assessing the agency's selected evaluation procedures, the "proper inquiry" is "whether there is any statutory or regulatory provision that **precludes** such use." *Tyler Construction Group v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009) (emphasis added).

Again, the Agency was only required to "consider whether the proposed prices are realistic for the work to be performed," and "reflect a clear understanding of the contract requirements." AR 14086. While the plaintiff is correct in pointing out that the Navy determined that prices for certain CLINs were unrealistically low, the Agency, looking to the proposal as a whole, determined that Leidos' proposed efficiencies explained why its prices were so low, and, thus, its prices were considered realistic. AR 25285. Even acknowledging that some discrete prices were unrealistically low, the SSEB never determined that there would be associated performance risks. AR 25410. Moreover, a significant portion of plaintiff's allegations related to whether Leidos' prices were unrealistically low hinge upon repeated citations to the declaration of an expert retained for litigation, rather than to documents that were concurrently produced throughout the course of evaluation and award.

After careful review of the parties' arguments, the Court finds that plaintiff failed to successfully establish that the Agency's price realism evaluation was inconsistent with the express terms of the Solicitation or that the Agency's evaluation was irrational or arbitrary and capricious. As such, the Court will not encroach upon the Agency's discretion in utilizing the price realism tool of its choosing.

D.      **Cost Realism**

In addition to its price realism arguments, plaintiff argues that "[t]he Navy's evaluation of offerors' prime direct labor rates was plainly unequal because the Navy misled Perspecta into raising its rates while at the same time allowing Leidos to propose lower rates for those same positions." Pl.'s MJAR at 20. In making this argument, plaintiff asserts that "the Navy did not scrutinize Leidos' methodology for selecting its rates in the manner it did for Perspecta." *Id*. at 21. Specifically, plaintiff contends that "the Navy accepted rates from Leidos that were lower than the rates in Perspecta's *initial proposal* that the Navy found unrealistic," and Leidos' allegedly "unrealistically low rates account for a delta of approximately $102 million between the two offerors." *Id*. (emphasis in original). Ultimately, plaintiff posits that "[t]he Navy's complete failure to analyze whether Leidos could perform at the cost it proposed, while at the same time insisting that Perspecta raise its rates to the Navy's self-identified realism floor, is arbitrary and capricious." *Id*. at 23.

In response, defendant-intervenor argues that "Perspecta appears to have either misunderstood the amended RFP evaluation criteria or otherwise made a business decision to increase its CPFF labor rates to the 25th percentile mark, rather than justify its proposed rates under the options available under the revised RFP." Def.-Int.'s CMJAR at 25. Moreover, defendant-intervenor contends that, even accepting plaintiff's arguments regarding alleged errors in the Agency's cost realism analysis, "Perspecta cannot demonstrate competitive prejudice" because "Leidos' total evaluated cost/price was lower than Perspecta's total evaluated cost/price by more than $526 million." *Id*. at 23 (citing AR 25435). Relatedly, defendant posits that "because the RFP provided for realism only as a tool to interrogate an offeror's understanding of technical requirements," Def.'s CMJAR at 28, when assessing the validity of the Agency's cost realism analysis, "[t]he question before the Court is . . . whether the agency unreasonably determined that Leidos' CLIN pricing did not reveal a lack of understanding as to the technical requirements of the contract." *Id*. at 25 (citing AR 14086). Finally, defendant points out that, if the Agency utilized the evaluation mechanism that Perspecta advocates using to analyze Leidos' pricing, "52% of Perspecta's fixed price CLIN pricing would be found 'unrealistically low.'" *Id*. at 27.

It is well settled that "contracting agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020). To successfully challenge a cost realism analysis, a protestor must demonstrate "the absence of a rational basis for the agency's decision." *CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 429 (2016) (internal citations omitted) (internal quotations omitted). When reviewing an agency's cost realism determination, "the Court defers to those agency conclusions that are rational and based on reasoned judgment." *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2003).

As part of the plaintiff's cost realism argument, plaintiff also alleges that the Agency engaged in uneven treatment. This Court has long held that "uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004) (citing *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir,

1995)), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  However, after careful review of the record, the Court does not believe that the Agency engaged in unequal treatment.

> As defendant correctly points out,

> [t]he RFP provided that 'cost realism will be performed for all cost reimbursement type CLINs to determine the most probable cost' of performance, and that the agency would evaluate 'whether the estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of contract requirements, and are consistent with the unique methods of performances and materials described in the Offeror's technical proposal and BOE.'

Def.'s CMJAR at 29 (quoting AR 588–89).  The Navy communicated cost realism concerns to both Leidos and Perspecta through Evaluation Notices ("ENs").  *See e.g.*, AR 12712; AR 12778.  After issuing the ENs, the Agency issued Amendment 11, which changed how it would evaluate CPFF labor rates.  *See* AR 12819.  As a result of the ENs and ensuing amendments, Perspecta raised its CPFF labor rates, AR 25282, while Leidos provided justifications and supporting documentation for its already-proposed rates.  *See* AR 14085; AR 19776.  The Navy evaluated Leidos' supporting documentation and determined such documentation adequately supported its proposed labor category pricing.  *See* AR 25280.  However, because Perspecta raised its labor rates to IGCE rates, the Agency did not need to analyze whether Perspecta's rates were realistic. *See* AR 25291; AR 25287.

As the Agency issued Amendment 11 allowing offerors to provide justifications for its proposed rates, the Navy was neither arbitrary nor capricious in determining that Leidos could perform at the cost it proposed or in allowing those rates to stand.  Moreover, as it was up to the offerors' discretion to choose whether to raise their rates or provide those justifications, the Agency did not treat offerors disparately in allowing such discretion.  For the reasons set forth above, the Agency's cost realism evaluations were not unequal, and, thus, the Court declines to set those evaluations aside now.

## E.    Unequal Discussions

Meaningful discussions "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit."  *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000).  However, FAR 15.306(d)(2) states that an agency "is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment."  Additionally, "an agency is not required to 'spoon-feed' offerors in order to have meaningful discussions."  *Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 343 (2009).  Finally, "[d]eficiencies or weaknesses that appear for the first time in a revised proposal during discussions do not oblige the agency to extend discussions further with that offeror."  *iAccess Techs., Inc. v. United States*, 143 Fed. Cl. 521, 538 (2019).

In addition to its aforementioned arguments, plaintiff alleges that "[t]he Navy's failure to conduct adequate discussions tainted its evaluation of Perspecta's proposal under the Technical and Management Approach factors," and that "[g]iven the . . . importance of these factors, the Navy's flawed discussions materially impacted Perspecta's evaluation score." Pl.'s MJAR at 24. Plaintiff further contends that "[t]he sheer number of evaluation findings directly resulting from the Navy's flawed discussions . . . demonstrates the significance of this error." *Id.*

1. **Factor 1**

In arguing that the Agency conducted unequal discussions, plaintiff specifically asserts that "[o]f the thirteen total weaknesses assigned to Perspecta under Factor 1, nine of them (including both significant weaknesses) were based upon language in Perspecta's FPR that existed in Perspecta's initial submission but that the Navy never raised with Perspecta during discussions." Pl.'s MJAR at 25. Moreover, plaintiff argues that "[g]iven the level of specificity with which the Navy framed its discussions, Perspecta reasonably understood that no additional issues existed in its initial proposal volume beyond those identified," particularly considering that nine of the Navy's Factor 1 findings "were based upon language that appeared nearly verbatim in Perspecta's initial proposal but were never raised during discussions." *Id.* at 26 (citing AR 12665). Finally, plaintiff asserts that "[h]ad Perspecta been aware that the Navy took issue with Perspecta's Factor 1 submission beyond the discrete concerns identified during discussions, Perspecta would have directly addressed the Navy's concerns, as it did with the issues that were raised." *Id.* at 28.

In response, defendant-intervenor asserts that "[b]oth of the significant weaknesses and all but one of the challenged weaknesses (Weaknesses 1, 2, 4, 5, and 7 under subfactor 1.1, and Weakness 1 under subfactor 1.2), resulted from changes Perspecta made to its FPR that were not present in its initial Technical proposal." Def.-Int.'s CMJAR at 30–31. "[T]he mere fact that some text remained unchanged between proposals," argues defendant, does not mean that the Agency's discussions were not meaningful, particularly as "Perspecta undertook a 'complete re-write'" as a result of those discussions, which ultimately elevated its otherwise unawardable Factor 1 score to "marginal." Def.'s CMJAR at 37.

The Court does not believe that the Navy engaged in unequal discussions. In fact, the discussions held as a result of the ENs were clearly to Perspecta's benefit, as it resulted in a higher overall rating. For example, Subfactor 1.1, "systems engineering," asked offerors to demonstrate an "understanding of the Government's Systems Engineering Plan [] and how its proposed subsections of the Systems Engineering Management Plan [] will benefit the Government" as well as an "understanding of the Government's Network Transformation/Modernization requirements and how its proposed approach will benefit the Government." AR 14081. The Navy assigned one Weakness, one Significant Weakness, and one deficiency to Perspecta's initial proposal, as it did "not fully describe[]" the "structure of the [Model Based Systems Engineering] Ecosystem," and "call[ed] into question [Perspecta']s understanding of the Government's Systems Engineering Plan." AR 12665. As a result, Perspecta did a "complete re-write" of that section, AR 21175, and the new approach was found not to be a performance risk and received a "marginal" rating. AR 25183–84. However, as defendant-intervenor correctly points out, "Perspecta's major overhaul of its systems engineering

approach in its FPR created new ambiguities and raised new concerns." Def.-Int.'s CMJAR; *see also* AR 30069.

As the Court previously stated, "[d]eficiencies or weaknesses that appear for the first time in a revised proposal during discussions do not oblige the agency to extend discussions further with that offeror." *iAccess Techs.*, 143 Fed. Cl. at 538. While plaintiff is technically correct in asserting that some of the language for which it received a weakness was present in the initial proposal, plaintiff completely ignores the context surrounding that language. The meaning of a sentence or clause can, and often does, completely change depending on what language surrounds it. Perspecta completely overhauled its Factor 1 approach as a result of the Navy's initial ENs, and the Agency was not obliged to extend discussions because new weakness arose out of final proposal revisions. As such, the Court does not find that the Agency conducted unequal discussions with regard to Factor 1.

### 2.     Factor 2

In addition to its arguments related to Factor 1, plaintiff alleges that the Navy engaged in inadequate and unequal discussions during the course of the procurement. Specifically, plaintiff argues that the Significant Weakness assigned under Subfactor 2.2 "was present in Perspecta's initial proposal and should have been addressed during discussions." Pl.'s MJAR at 29 (citing *Q Integrated Cos., LLC v. United States*, 126 Fed. Cl. 124, 146 (2016)). Plaintiff additionally argues that the Weakness and Significant Weakness it was assigned under Subfactor 2.3 were "the result of misleading and unequal discussions." *Id*. at 30.

In response, defendant-intervenor again asserts that, for Subfactors 2.2 and 2.3, "Perspecta's weaknesses were a result of flaws which Perspecta introduced into its FPR that were not apparent in its initial proposal." Def.-Int.'s CMJAR at 35. Defendant likewise presents arguments for Factor 2 that are very similar to those it made for Factor 1. *See generally* Def.'s CMJAR at 38–41. The Court once again must note that "[d]eficiencies or weaknesses that appear for the first time in a revised proposal during discussions do not oblige the agency to extend discussions further with that offeror." *iAccess Techs.*, 143 Fed. Cl. at 538. As Perspecta made significant changes to its management approach when submitting its final proposal, *see* AR 21802–3, the Agency was under no legal obligation to conduct additional discussions regarding any weaknesses that arose out of those changes. Therefore, as above, the Court concludes that the Agency's discussions related to Factor 2 were meaningful and not inadequate or unequal.

### F.     Technical Evaluation

Throughout the course of briefing, plaintiff asserts that "the Navy failed to conduct meaningful discussions with respect to nine negative findings evaluated under Factor 1 and another three under Factor 2." Pl.'s Resp. at 21. Consequently, plaintiff alleges that the Navy's evaluation under both factors was "disparate and irrational." Pl.'s MJAR at 32; *see also id*. at 36. In arguing that the Agency engaged in disparate treatment, plaintiff contends that the Navy assigned it weaknesses and significant weaknesses for proposing similar features to those for which the Navy credited Leidos. *Id*. at 32; *see also id*. at 36. Plaintiff points to a number of

weaknesses and significant weaknesses as examples of the Agency's allegedly disparate treatment.

In response, defendant-intervenor argues that "Perspecta's and Leidos' proposals were substantively distinguishable, and therefore Perspecta's claim that the Navy's technical evaluation was arbitrary and irrational fails." Def.-Int.'s CMJAR at 38. Defendant contends that "Perspecta points to no error in the agency's technical evaluation." Def.'s Reply at 17. Additionally, as the SSEB fully explained its basis for assigning each of the ratings challenged by Perspecta, "examin[ing] the relevant data and articulat[ing] a rational connection between the facts found and the choice made," defendant asserts that "Perspecta's myriad of challenges fail." Def.'s CMJAR at 48 (quoting *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 139 (2020)).

This Court recently stated that the "scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals." *Tech. Innovation*, 149 Fed. Cl. at 139. "To prevail [on a disparate treatment claim], a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals," or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing *Enhanced Veterans Solutions, Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). "If a protestor does not [meet this threshold], then the court should dismiss the claim. To allow otherwise would give a court free reign [sic] to second-guess the agency's discretionary determinations underlying its technical ratings." *Id.* at 1373.

As the Court has previously stated, "[i]n cases that involve the application of judgment in a highly technical area, the Court's main task instead is to ensure that the agency examined the relevant data and articulated a rational connection between the facts found and the choice made." *Tech. Innovation*, 149 Fed. Cl. at 139. Upon careful review of the record, it is clear to the Court that plaintiff's allegations merely amount to plaintiff second-guessing the Navy's discretionary determinations. Moreover, as the offerors did not submit identical proposals, the Agency necessarily entered into different—but not unequal—discussions regarding those proposals. As nothing in the record supports plaintiff's assertions that the technical evaluation was disparate and irrational, the Court will not endeavor to set it aside now.

## G.    Prejudice and Injunctive Relief

Finally, plaintiff alleges that the "myriad errors in the Navy's evaluation . . . culminated in a flawed best value decision where the SSA failed to exercise any independent judgment," and that, "[b]ut for these errors, Perspecta would have had a substantial chance at award." Pl.'s MJAR at 38–39. As defendant points out, "officials have substantial discretion to determine which proposal represents the best value for the Government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Additionally, this Court is "generally loathe to disturb a best-value award so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made." *Afghan Am. Army Servs.*, 90 Fed. Cl. at 360.

So long as there exists a "rational connection between the facts found and the choice made," the Court will not set a procurement decision aside. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 390 (2003) (citing *Motor Vehicle Mfrs. Ass'n v. State farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As the Court is not persuaded by plaintiff's contentions that the Agency conducted a flawed evaluation and award, the Court does not believe that plaintiff was prejudiced by such alleged procurement flaws.

Additionally, plaintiff alleges that it is entitled to permanent injunctive relief. When analyzing whether a permanent injunction is proper, a court must analyze "whether, as it must, the plaintiff has succeeded on the merits of the case." *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). As the plaintiff did not succeed on the merits of its case, plaintiff's request for a permanent injunction of course fails.

## IV.    Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is hereby **DENIED**. Defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are hereby **GRANTED**. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge